IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **AMY LEISE, as the Personal Representative of the Estate of Donald E. Ruch, deceased,** | |
| **Plaintiff,** | **8:22CV142** |
| vs. | **ORDER** |
| **THE UNITED STATES OF AMERICA,** | |
| **Defendant.** | |

    This matter is before the Court on the Motion for Protective Order (Filing No. 65) filed by Defendant, The United States of America. The United States seeks a court order limiting from disclosure privileged documents it claims it inadvertently disclosed in this litigation. For the following reasons, the Court will grant Defendant's Motion for Protective Order.

## BACKGROUND

    On April 12, 2022, Plaintiff, Amy Leise ("Leise"), the personal representative of the estate of Donald E. Ruch ("Decedent"), commenced this wrongful death and survivorship action pursuant to the Federal Tort Claims Act against the defendant, the United States of America (the "United States"), for the death of Leise's uncle, the Decedent. (Filing No. 1).

    The Decedent was a Vietnam war veteran who often received medical treatment at the Veteran Administration's Nebraska-Western Iowa Health Care System in Omaha, Nebraska (the "Omaha VA Hospital"). At the time of his death, the Decedent was 73-years old and a paraplegic wheelchair user. On October 23, 2019, the Veteran's Transportation Service ("VTS") offered by the Omaha VA Hospital picked up the Decedent and another veteran in a wheelchair accessible van to take them to the Omaha VA Hospital for medical appointments. At approximately 2:00 p.m., the van pulled into the front circle outside the West entrance of the VA Hospital. The van driver untied both passengers' wheelchairs, opened the van's rear door, and lowered the ramp to begin assisting the other veteran out of the van via the rear wheelchair lift. The van driver then took the other veteran into the medical center, leaving the Decedent unattended and unsecured in the van. Seemingly unaware that the van driver had left, the Decedent started backing towards the

rear of the van, causing his 400-pound wheelchair to roll out the back, which then pulled the Decedent to the ground and caused him to hit his head on the ground.

Three VA employees walking near the front circle heard the fall and went to assist the Decedent. One of those individuals asked the van driver to call the VA Rapid Response Team ("RRT"). The driver dialed the number for the Omaha VA emergency response team, but was told by the Operator that he should call 911 for non-VA responders because of the "VA policy that RRT's are not to be called for the exterior of the hospital." The Operator transferred the caller to the VA Police dispatch, who confirmed that non-VA 911 needed to be called. Non-VA emergency responders, including the Omaha Fire department and EMS paramedics, responded to the scene. The VA Police ultimately also responded to the scene. At 3:09 p.m. the Decedent was transported to the Emergency Department at the University of Nebraska Medical Center. During his initial triage, the Decedent began experiencing seizure-like symptoms from a subdural hematoma; Defendant was placed on life support at 5:28 p.m., and died the next morning. (Filing No. 1).

Following this incident, the VA conducted a Root Cause Analysis ("RCA"), which involves a multi-disciplinary team of staff convened to investigate events and review care delivery to identify and correct the cause of an adverse event. The RCA includes a team of staff and/or practitioners that investigate events, gather data, and review VHA care delivery to identify the cause of an event to hopefully prevent the reoccurrence of those events.

Leise filed a complaint with the VA's Office of Inspector General ("OIG") Hotline on October 29, 2019, and sought information from Omaha VA Hospital regarding the Decedent's fall. The OIG Hotline is responsible for responding to complaints concerning veterans or the VA relating to allegations of unlawful activity, violations of rules or regulations, or mismanagement of VA programs and operations. The OIG consulted the RCA team for information regarding the incident, and the RCA responded with the RCA report, which is typical in these processes. The Chief of Staff at Omaha VA Hospital reached out to Leise on November 29, 2019, and identified the areas of recommendations for action following Leise's OIG Hotline complaint. The VA Response to the OIG Hotline complaint was issued on January 22, 2020. (Filing No. 75-5). The OIG closed its inspection on March 27, 2020.

Pursuant to Leise's FOIA request, the OIG provided Leise with the VA Response to the OIG Hotline complaint on January 6, 2021, which redacted the information protected under 38 U.S.C. § 5701 and FOIA Exemption 6, 5 U.S.C. § 552(b), including information pertaining to the

2

RCA. Specifically, information regarding disciplinary or adverse action taken against subjects of their complaint, and the full findings and recommendations of the RCA, were redacted. ([Filing No. 75-5](#)).

During discovery in this case, Leise requested production of the RCA and the full OIG Response from the United States. On February 1, 2023, the United States objected that the RCA was privileged as a medical-quality assurance document under [38 U.S.C. § 5705](#); the United States took the position that the VA's OIG Response may also be privileged, but it needed more time to make that determination. ([Filing No. 29](#)). On February 13, 2023, twelve days later, the United States produced two documents, a one-page email from the OIG Senior Hotline Analyst to Omaha VA Hospital, and a complete and unredacted copy of the OIG Response, which includes the full RCA findings. ([Filing No. 30](#)). These documents were marked as confidential, but not marked as privileged. ([Filing No. 30](#)). The United States maintains it inadvertently produced the unredacted OIG Response at bates stamp D_00000283-D_00000296. ([Filing No. 67](#)). At the time of the disclosure, the case was stayed for mediation. ([Filing No. 28](#)). The case was stayed through August 2023.

Leise has since utilized the unredacted OIG Response in this litigation. For example, during the deposition of Amy Fahn on September 27, 2023, Plaintiff's counsel marked the unredacted OIG Response as an exhibit. During Ms. Fahn's deposition, the United States did not object to questions about the OIG Response and its use during the deposition, although it did object to questions about the RCA on the grounds of medical quality-assurance privilege under § 5705. ([Filing No. 75-2](#)).

On October 17, 2023, Plaintiff's counsel sent the United States a letter regarding Defendant's objections to discovery on the basis of medical quality-assurance privilege under § 5705. ([Filing No. 75-12](#)). During counsel's meet and confer on those discovery issues in December 2023, the United States claims it discovered for the first time it had inadvertently disclosed the unredacted OIG Response containing the full RCA findings. ([Filing No. 79 at p. 3](#)). The undersigned magistrate judge held a telephone conference on the parties' discovery dispute on January 17, 2024. (Filing No. 61). The Court gave the United States leave to file a motion for protective order on the issue.

The United States has now filed a Motion for Protective Order ([Filing No. 65](#)) to limit disclosure of the RCA and any documents generated by the RCA team, including the unredacted

VA's response to the OIG Hotline inquiry that discusses the findings and the corrective actions plans, specifically produced at bates stamp D_00000283-D_00000296. The United States asserts such documents are confidential and privileged medical quality-assurance documents under 28 U.S.C. § 5705 and 38 CFR §§ 17.500-511. (Filing No. 67). The United States asserts the medical quality-assurance privilege is an unwaivable privilege under the plain language of the statute. Additionally, the United States cites the parties' stipulated protective order (Filing No. 25), which provides that production of privileged documents, "whether disclosed inadvertently or otherwise, is not a waiver of the privilege or protection from discovery in this case or in any other federal or state proceeding." (Filing No. 25 at p. 5).

Leise opposes the motion, asserting it is untimely and unduly prejudicial because the OIG Response has "been woven into the fabric of this case." Leise further argues that because the incident in this case occurred outside of the medical facility, and the VA refused medical care to the Decedent, the RCA findings are not "medical quality-assurance records" under 38 U.S.C. § 5705, but even if they were, Plaintiff contends the United States has waived such privilege by its disclosure and belated discovery of such disclosure. (Filing No. 74).

## ANALYSIS

Federal Rule of Civil Procedure 26(b) provides, "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1). "When a party withholds information otherwise discoverable by claiming that the information is privileged," the party must expressly make the claim and describe the withheld documents "in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A)(i)-(ii). The notice should be as specific as possible in identifying the information and stating the basis for the claim. It is within the court's discretion to determine whether a claim of privilege or protection was made at a reasonable time when delay is part of the waiver determination under the governing law. See Fed. R. Civ. P. 26(b)(5) advisory committee's note to 2006 amendments.

Rule 26(c) provides "The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). The burden is on the moving party to show the necessity of issuance of a protective

order. See *Gen. Dynamics Corp. v. Selb Mfg. Co.*, 481 F.2d 1204, 1212 (8th Cir. 1973) (quoting Wright & Miller, Federal Practice and Procedure: Civil § 2035 at 264-65). Under Rule 26(c), courts have broad discretion in deciding whether protection is warranted and in determining the type and terms of protection to be ordered. *Parker v. United States,* No. 8:18CV123, 2020 WL 729211 (D. Neb. Feb. 13, 2020).

The United States argues that the RCA and unredacted OIG Response containing the RCA findings are "medical quality-assurance records" under 38 U.S.C. § 5705, and are therefore confidential and privileged from disclosure. (Filing No. 67 at pp. 2-4). There is no dispute the United States properly claimed the RCA itself was privileged, but it now argues that all other documents generated by the RCA team, including the unredacted response to the OIG inquiry containing the RCA findings, are privileged and protected from disclosure. The United States contends the plain language of § 5705 precludes waiver of the RCA findings by its inadvertent disclosure. (Filing No. 67 at pp. 5-6).

**I.     The RCA findings and response to OIG are privileged under 38 U.S.C. § 5705**

In deciding whether to grant the United States' motion, the Court must first determine whether the RCA and the unredacted OIG response containing the RCA findings are privileged. The party seeking to assert a privilege has the burden of establishing that the privilege applies. *United States v. Ivers*, 967 F.3d 709, 715 (8th Cir. 2020) (citing *Bouschor v. United States*, 316 F.2d 451, 456 (8th Cir. 1963)). The United States contends that the RCA is privileged and should be protected from disclosure as medical quality-assurance documents under 38 U.S.C. § 5705. The United States argues the privilege of these documents is for the purpose of protecting medical quality-assurance so that medical professionals can be relied upon to be candid in their review of the quality and utilization of healthcare resources. Leise counters that because the VA refused to medically treat the Decedent, the RCA is not a medical quality-assurance document under § 5705, and is therefore not statutorily privileged.

Under § 5705, "[r]ecords or documents created by the Department [of Veterans Affairs] as part of a medical quality-assurance program are confidential and privileged and may not be disclosed to any person or entity except" under certain delineated circumstances that do not apply in this case. 38 U.S.C. § 5705(a). A "medical quality-assurance program" is defined as "a department systematic health-care review activity designated by the Secretary to be carried out by

or for the Department for" the purposes of "improving the quality of medical care or improving the utilization of health-care resources in Department health-care facilities." 38 U.S.C. 5705(c)(1)-(2). A document must be part of a "medical quality-assurance program" to qualify for the privilege. See *Velosky v. United States*, No. 5:21-cv-5091, 2022 WL 5435481, at *1 (W.D. Ark. Oct. 7, 2022) (citing 38 U.S.C. § 5705(a)). Documents and parts of documents that contain discussions relating to the quality of VA medical care or "utilization of VA medical resources" by healthcare evaluators during the course of review of a quality assurance information or data, even if they do not identify practitioners, patients, or reviewers, are confidential and privileged. 38 C.F.R. § 17.501(c)(2).

A root cause analysis "is a process for identifying the basic or contributing causal factors that underlie variations in performance associated with adverse clinical events or close calls." (Filing 66-1 at p. 5); see also 38 C.F.R. § 17.501(a). "In other words, if an 'adverse clinical event 'occurs—such as failure to diagnose and properly treat a patient's cancer—the VA medical facility may put together a team to investigate and determine the cause of the facility's failures." *Velosky*, 2022 WL 5435481, at *1; see also *Maki v. United States*, No. CIV.A. 7:07CV443, 2008 WL 1756330, at *2 (W.D. Va. Apr. 16, 2008) ("With regard to the Root Cause Analysis ("RCA"), it is clear that it meets the requirements of 38 C.F.R. § 17.501(a)(2) as it plainly appears to be a "focused review" addressing a specific incident."). The United States identified RCAs as "medical quality-assurance records" for purposes of privilege through the VHA Directive 2008-007, which states, "focused reviews, including RCAs, which are designated at the outset of the review as protected by 38 U.S.C. § 5705, are automatically and undoubtedly privileged as a matter of law." *Workman v. United States*, No. 3:15-cv-14327, 2016 WL 3248513 (S.D. W. Va. June 13, 2016). Leise contends VHA Directive 2008-007 expired in 2013 before the incident at issue occurred, but regardless, the RCA is still properly categorized under § 5705.

The United States argues that the medical quality-assurance privilege extends to the utilization of health-care support resources, such as transportation by the VTS utilized by the Decedent in this case. (Filing No. 78-1 at pp. 1-2). The Court agrees. The VTS is a form of health-care resources for the VA since it provides patients access to the medical services within the VA. The RCA documents and response to the OIG contain discussions relating to the quality of VA utilization of VA medical resources. The OIG Hotline is responsible for responding to complaints concerning veterans or the VA that relate to potentially unlawful activity or potential

6

violations of rules or regulations; fraud, waste, and abuse; and gross mismanagement of VA programs and operations. See <https://www.vaoig.gov/hotline/online-forms>.

The circumstances surrounding the Decedent's fall while utilizing the VTS would fall under the mismanagement of VA programs and operations. The OIG is responsible for conducting oversight of VA's programs and operations. The Court finds that the RCA into the Decedent's death from utilizing a VA medical resource, the VTS, is a "medical quality-assurance record" and that the RCA's findings are a form of "Department systematic health-care review activity designated by the Secretary to be carried out by or for the Department for" the purposes of "improving the utilization of health-care resources in Department health-care facilities." Therefore, such records are confidential and privileged. See 38 C.F.R. § 17.501(a)-(c)(2) ("Documents and parts of documents are considered confidential and privileged if they were produced by or for the VA in the process of conducting systematic healthcare reviews for the purpose of improving the quality of health care or improving the utilization of healthcare resources in VA healthcare facilities . . ." and "[c]ontain discussions relating to the quality of VA medical care or utilization of VA medical resources by healthcare evaluators during the course of a review of quality assurance information or data. . .").

The Court finds the RCA and OIG Response containing those RCA findings are both records and documents created by the VA as part of a medical quality-assurance program. The OIG received the VA's RCA findings to properly investigate the incident reported by Leise. Therefore, the RCA and the unredacted OIG Response containing those RCA findings are confidential and privileged under § 5705.

II. **The medical quality assurance privilege under 38 U.S.C. § 5705 is not waivable**

The Court must next address whether the United States' disclosure of the unredacted OIG Response containing the full RCA findings waived the privilege afforded under § 5705. The United States asserts it inadvertently disclosed the unredacted OIG Response in February 2023, but did not discover its inadvertent disclosure until it consulted with the VA in preparation for a discovery dispute conference set in January 2024. The United States asserts it then promptly sent notice of the inadvertent disclosure and clawback request to Leise pursuant to Fed. R. Civ. P. 26(b)(5)(B). Leise disputes this, arguing the United States knowingly and intentionally disclosed the unredacted OIG Response, and did not promptly provide notice.

7

Black's Law Dictionary defines an "inadvertent disclosure" as "the accidental revelation of confidential information, as by sending it to a wrong e-mail address or by negligently allowing another person to overhear a conversation." Disclosure, Black's Law Dictionary (11th ed. 2019). Intentional disclosure requires "an intention that the opposing party see the [privileged content]." See *Gundacker v. Unisys Corp.*, 151 F.3d 842, 848 (8th Cir. 1998).

After review, it is clear the United States inadvertently disclosed the unredacted OIG Response containing the RCA findings. The United States made one disclosure of the unredacted document on February 13, 2023, in response to Plaintiff's discovery request. The United States specifically objected to producing the RCA findings themselves on grounds of privilege; however, those RCA findings were contained within another document—the unredacted OIG Response. The United States did not disclose the unredacted OIG Response containing the RCA findings in order to rely on it or otherwise utilize it in this litigation; instead, the United States has consistently maintained that the RCA findings are privileged. Although Leise asserts the United States "was fully aware that Plaintiff had the RCA findings and recommendations and was relying on them in September 2023," Leise does not assert the opposite is true, i.e., that the United States disclosed and was relying on the RCA findings, the latter of which would demonstrate disclosure was intentional. Instead, the United States objected to Plaintiff's counsel's questions regarding the RCA during depositions. See Filing No. 75-2; Filing No. 75-10. Nothing about the United States' actions indicate an intentional disclosure of the RCA findings.

Leise contends that, even if the RCA findings are a privileged medical quality-assurance document under § 5705, and even if the United States inadvertently disclosed the unredacted OIG Response containing the RCA findings, such disclosure waived the privilege. Leise asserts the medical quality-assurance privilege under § 5705 is analogous to the attorney client privilege, and therefore waiver is governed by Federal Rule of Evidence 502(b). (Filing No. 74 at p. 18). The United States counters that the medical quality-assurance privilege under § 5705 cannot be waived, pointing to a similarly drafted statute related to Department of Defense medical quality-assurance records, 10 U.S.C. § 1102, which courts have found is not a waivable privilege. (Filing No. 67 at pp. 5-6). The Court agrees with the United States.

The confidentiality provisions for medical quality-assurance records created by or for the Department of Defense under 10 U.S.C. § 1102 uses statutory language virtually identical to the language of 38 U.S.C. § 5705. At least one court has found 10 U.S.C. § 1102 precludes waiver of

8

the medical quality-assurance privilege through inadvertent disclosure of such records. *Smith ex rel. Smith v. United States,* 193 F.R.D. 201, 205 (D. Del. 2000). In making that determination, the court looked to the purpose of the privilege: "The intent of § 1102 is to limit the parties to whom the reviews may be provided and purposes for which the quality-assurance reports may be used." *Id*. The court also looked to the plain language of the statute, which "explicitly prevents the use or dissemination of this information by parties or for reasons not so excepted" because it provides:

> Any person who willfully discloses a medical quality assurance record other than as provided in this section, knowing that such record is a medical quality assurance record, shall be fined not more than $3,000 in the case of a first offense and not more than $20,000 in the case of a subsequent offense.

10 U.S.C. § 1102(k). The court reasoned that "by excepting the parties who may make use of this information under subsection (c)," which delineates certain limited circumstances under which the records may disclosed, but "otherwise precluding use by those not so excepted under threat of civil penalty," the statute "essentially precludes the use of the discovery defense of 'waiver' generally applicable to other privileges (i.e., attorney-client, confidentiality) under similar circumstances." *Smith*, 193 F.R.D. at 205-06 (citing *Cole v. McNaughton*, 742 F.Supp. 587 (W.D. Okla. 1990) ("[T]he language of the statute can be understood *only* to preclude the possibility of a waiver.") (emphasis in original); see also *Romero v. Witherspoon*, 211 F.3d 125 (5th Cir. 2000) ("Section 1102 contains very specific exceptions to the general rule that medical quality-assurance records are confidential and not admissible at trial . . . we [have] held that the exceptions set forth by Congress in § 1102(c) are exclusive, and that general rules of evidence that would render an otherwise inadmissible document admissible, such as waiver or laches, do not apply to medical quality assurance records.") (citing *In re U.S.*, 864 F.2d 1153, 1156 (5th Cir. 1989) ("The representatives of the government with the responsibility for this litigation have no discretion to release medical quality assurance records beyond those instances specifically detailed in the statute. Laches may not be used to create a greater right or privilege than that expressly created by the Congress.").

      Similar to 10 U.S.C. § 1102, 38 U.S.C. § 5705 provides only four circumstances under which confidential and privileged medical quality-assurance program documents may be disclosed:

> (A) To a Federal agency or private organization, if such record or document is needed by such agency or organization to perform licensing or accreditation

functions related to Department health-care facilities or to perform monitoring, required by statute, of Department health-care facilities.

(B) To a Federal executive agency or provider of health-care services, if such record or document is required by such agency or provider for participation by the Department in a health-care program with such agency or provider.

(C) To a criminal or civil law enforcement governmental agency or instrumentality charged under applicable law with the protection of the public health or safety, if a qualified representative of such agency or instrumentality makes a written request that such record or document be provided for a purpose authorized by law.
(D) To health-care personnel, to the extent necessary to meet a medical emergency affecting the health or safety of any individual.

38 U.S.C. § 5705(b)(1)(A)-(D). Apart from these specific permissible disclosures, § 5705(e) provides:

> Any person who, knowing that a document or record is a document or record described in subsection (a) of this section, willfully discloses such record or document except as provided for in subsection (b) of this section shall be fined not more than $5,000 in the case of a first offense and not more than $20,000 in the case of a subsequent offense.

38 U.S.C. § 5705(e). As with § 1102, "by excepting the parties who may make use of" medical quality-assurance program documents, but "otherwise precluding use by those not so excepted under threat of civil penalty," § 5705(e) "essentially precludes the use of the discovery defense of 'waiver' generally applicable to other privileges." Smith, 193 F.R.D. at 205-06. The exceptions for disclosure set forth under § 5705(b)(1) "are exclusive," and therefore "general rules of evidence that would render an otherwise inadmissible document admissible, such as waiver or laches, do not apply to medical quality assurance records." Witherspoon, 211 F.3d at 125. The Court therefore finds the medical quality-assurance records privilege afforded by § 5705 cannot be waived by the United States' inadvertent disclosure of the RCA findings.

Finally, neither party fully addresses the effect of the parties' stipulated protective order (Filing No. 25) on this issue. Specifically, the stipulated protective order provides:

> The production of privileged or protected electronically stored information ("ESI") or paper documents, whether disclosed inadvertently or otherwise, is not a waiver of the privilege or protection from discovery in this case or in any other federal or state proceeding. This Protective Order shall be interpreted to provide the maximum protection allowed by Federal Rule of Evidence 502(d).

> . . .
>
> Any party who discloses documents that are privileged, protected, or otherwise immune from discovery shall, promptly upon discovery of such disclosure, advise the Receiving Party and request that the documents be returned. The Receiving Party shall return such produced documents or certify their destruction, including all copies, within 14 days of receiving such a written request.

(Filing No. 25 at p. 5). Under Rule 502(d), "[a] federal court may order that the privilege or protection is not waived by disclosure connected with the litigation pending before the court—in which event the disclosure is also not a waiver in any other federal or state proceeding." Fed. R. Evid. 502(d). One of the main purposes for enacting Rule 502(d) was to resolve longstanding disputes regarding the effect of inadvertent disclosures of privileged information and subject matter waivers. *Logsdon v. BNSF Ry. Co.*, No. 8:15CV232, 2017 WL 1411500, at *1 (D. Neb. Apr. 19, 2017). In this case, the parties' agreed, court-entered protective order provides that the claw-back and non-waiver provisions for inadvertent disclosures "shall be interpreted to provide the maximum protection allowed by Federal Rule of Evidence 502(d)." Thus, even if the medical quality-assurance program privilege under § 5705 is waivable, the terms of the parties' agreed protective order in this case would still preclude waiver for the United States' inadvertent disclosure of the unredacted OIG Response containing the privileged RCA findings. Accordingly,

**IT IS ORDERED:**

1. The United States' Motion for Protective Order (Filing No. 65) is granted.
2. Plaintiff shall return the documents produced at bates stamp D_00000283-D_00000296 or certify their destruction, including all copies, within 14-days of this Order.

Dated this 25th day of March 2024.

BY THE COURT:

s/ Michael D. Nelson
United States Magistrate Judge